**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MICHIGAN**

COUNTY OF BARRY, dba THORNAPPLE
MANOR,

    Plaintiff,

       v.

UNITED STATES OF AMERICA,

    Defendant.

Case No. _____

## COMPLAINT

County of Barry, dba Thornapple Manor ("Plaintiff"), by and through undersigned counsel, files this complaint against the United States of America ("Defendant"), for a refund of internal revenue taxes totaling $4,931,295.55, plus interest and additional amounts as provided by law. This case arises out of the wrongful denial by the Internal Revenue Service ("IRS") of Plaintiff's claims for the employee retention tax credit ("ERC") for the first three quarters of 2021.

## PARTIES

1.      Plaintiff is a long- and short-term care facility operating in Barry County, Michigan. Plaintiff is organized under Michigan Public Act 280, which allows for Michigan counties to operate skilled nursing facilities under the auspices of the counties' Departments of Health and Human Services. The Barry County Department of Health and Human Services Board, which oversees Plaintiff, has two members appointed by the Barry County Commissioners and one appointed by the Governor of Michigan. Pursuant to 26 U.S.C. § 3134(f)(2)(B)(ii), Plaintiff was eligible to claim the ERC because its principal purpose is to provide medical care.

2.      Defendant is the United States of America.

1

## JURISDICTION AND VENUE

3.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1340, and 1346(a)(1), as well as 26 U.S.C. § 7422.

4.      Venue is proper in this Court under 28 U.S.C. §§ 1402(a)(2) and 1391. Plaintiff has its principal place of business in this judicial district.

## THE EMPLOYEE RETENTION TAX CREDIT

5.      The ERC is a fully refundable tax credit created by Congress in response to the unprecedented impacts of the COVID-19 pandemic.

6.      To encourage businesses to retain employees during this period of economic upheaval, Congress passed an extremely broad, permissive credit as part of the Coronavirus Aid, Relief, and Economic Security ("CARES") Act in March 2020.[1]

7.      Although governmental entities like Plaintiff were originally exempted from the ERC, the statute was amended to allow such entities whose principal purpose is to provide medical care to apply for the ERC beginning in the first quarter of 2021. *See* 26 U.S.C. § 3134(f)(2)(B)(ii).

8.      The ERC is a "credit against applicable employment taxes for each calendar quarter" in an "amount equal to 70 percent of the qualified wages with respect to each employee of such employer for such calendar quarter." *Id.* § 3134(a).

9.      For purposes of the ERC, the amount of qualified wages for each employee is capped at $10,000 per quarter. *Id.* § 3134(b)(1)(A).

---

[1] The current version of the ERC in 26 U.S.C. § 3134 was enacted after the events giving rise to this Complaint. During the first three quarters of 2021, the relevant text was originally in the CARES Act and later in an earlier version of § 3134. Because the relevant requirements remained the same throughout 2021, this Complaint cites to the current version of § 3134 for ease.

10.    Businesses claiming the ERC must be "eligible employers." There are three pathways to being an eligible employer. Plaintiff's claims were based on the pathway available to businesses whose operations were "fully or partially suspended during the calendar quarter due to orders from an appropriate governmental authority limiting commerce, travel, or group meetings (for commercial, social, religious, or other purposes) due to the coronavirus disease 2019 (COVID–19)." *Id.* § 3134(c)(2)(A)(ii)(I).

11.    As an essential business, Plaintiff was not fully shut down during the pandemic, but it did experience a partial suspension throughout the first three quarters of 2021.

12.    Because Plaintiff had fewer than 500 employees at all relevant times, its qualified wages were those paid during the period of partial suspension each quarter. That partial suspension was continuous and uninterrupted during the relevant timeframe.

13.    The terms "partial suspension" and "orders form an appropriate governmental authority" are not defined in the statute.

14.    The IRS subsequently issued Notice 2021-20, which purported to restrict the universe of government orders and to impose limitations, such as a "nominal effect" test, on what constitutes a partial suspension.

15.    The United States has taken the position that Notice 2021-20 operates only as a safe harbor and is not a basis for denying ERC claims. *See Stenson Tamaddon, LLC v. United States*, No. 2:24-cv-1123, ECF No. 44 at 7 (D. Ariz. Jan. 6, 2025) ("Effectively, [the partial suspension test] is a safe harbor; taxpayers whose gross receipts or hours have been impacted at that level can rely on the IRS not denying their ERC claim on that basis. Properly understood, it isn't an eligibility requirement."). Specifically, the United States' position is that businesses that do not

meet the Notice 2021-20 requirements are still eligible if they can demonstrate entitlement under a "facts and circumstances" test. *Id.*

16.    However, in practice, Notice 2021-20 has operated as a legislative rule that was issued without notice-and-comment rulemaking in violation of the Administrative Procedure Act. The IRS's denial of Plaintiff's credit claims was based heavily on Notice 2021-20, and no independent facts and circumstances test was applied. The IRS's reliance on Notice 2021-20 in this case was therefore improper.

## QUALIFYING GOVERNMENT ORDERS

17.    Throughout the COVID-19 pandemic, government orders touched nearly every aspect of Plaintiff's operations. Orders came from federal and state officials, with state officials frequently mandating compliance with federal standards. In all events, these orders were, by their own terms, mandatory.

18.    For instance, the Michigan Department of Licensing and Regulatory Affairs ("MDLRA") throughout the first three quarters of 2021 required residential care facilities like Plaintiff to adopt an infection prevention and control program that "must be based on an accepted national standard."  The "likely national standard" was the recommendations provided by the Centers for Disease Control and Prevention ("CDC"). MDLRA was clear that "[o]nce a provider adopts a national set of standards, these standards are viewed as required, and no longer just recommendations."

19.    Consistent with that obligation, Plaintiff adopted CDC guidance, including as set forth in the document entitled "Interim Infection Prevention and Control Recommendations to Prevent SARS-Cov-2 Spread in Nursing Homes," as binding orders. That required Plaintiff to create a "COVID-19 care unit," which "could be a dedicated floor, unit, or wing in the facility or

4

a group of rooms at the end of the unit that will be used to cohort residents with SARS-CoV-2 infection." Plaintiff was also required to have a "plan for managing visitation, including use of restrictions when necessary." This included, under appropriate circumstances, "requiring temporary restriction of indoor visitors, except for compassionate care reasons."

20.     Because Plaintiff was required to follow the CDC's standards, Plaintiff was also required to quarantine residents in various scenarios, including in certain cases upon admission and/or readmission after leaving and returning. Quarantined residents were not permitted to share rooms with other residents.

21.     Also as a result of the requirement to adhere to the CDC's standards, Plaintiff had to isolate residents in the event of a "single new case" of COVID among staff or residents. In such scenarios, residents "should generally be restricted to their rooms and serial SARS-CoV-2 testing performed."

22.     Throughout the first three quarters of 2021, the Michigan Department of Health and Human Services ("MDHHS"), through an order entitled "COVID-19 Response: Policy for COVID Relief (CR) Facilities to Treat COVID-19 Residents Requiring Nursing Facility Care in Limited Circumstances," separately required Plaintiff to have a "designated COVID-positive area," such as a "unit, wing, or separate building," as a condition for accepting or retaining residents with COVID-19. This requirement is also traceable to Michigan Senate Bill 1094, whose requirements MDHHS was implementing through its order.

23.     Although phrased conditionally—such a unit was only mandated if residents with COVID-19 were accepted or retained—the MDHHS order had the clear effect of being a mandate. If Plaintiff had to remove every resident who tested positive, it would have suffered a decline in its occupancy, as families would not have allowed their loved ones to be housed in a place that

5

could not accommodate them if they became ill. Plaintiff therefore applied for and received

permission to retain existing residents with COVID-19, which in turn subjected Plaintiff to a clear

obligation to have a designated COVID-19 unit.

24.    If Plaintiff had elected not to apply for such licensure, it would have been subject

to a government order preventing it from caring for COVID-positive residents, and that would

itself have effectuated a partial suspension due to the inability to retain residents who tested

positive. Specifically, MDHHS required non-COVID Relief Facilities to "transfer any COVID-

positive residents to an alternate location as soon as practicable."

25.    Put differently, even to the extent that the MDHHS order presented facilities with

a choice, any selection they made would lead to a partial suspension due to a government order.

Either they were required to set aside beds for COVID-positive residents, thereby keeping them

vacant even when other would-be residents could have used them, or they were required to keep

beds away from COVID-positive residents who otherwise would want to use them.

26.    Plaintiff was also subject to other requirements imposed by MDHHS. For instance,

a December 8, 2020 order entitled "Emergency Order Under MCL 333.2253—Requirements for

Residential Care Facilities—Recission of October 21, 2020 Order," which was in effect until

March 2, 2021, obligated residential care facilities to "limit communal dining and internal and

external group activities consistent with the Center[s] for Medicare and Medicaid Service ('CMS')

guidance included in QSO-20-39-NH (issued on September 17, 2020)." This was not optional, as

MDHHS said that facilities "shall" follow CMS guidance, which in turn required social distancing

and "additional limitations based on [the] status of COVID-19 infections in the facility."

Additionally, MDHHS required facilities, subject to certain exceptions, to "prohibit visitors."

Again, this was phrased in mandatory terms as something that facilities "must" do.

27.    QSO-20-39-NH also required the creation of a COVID unit, separate and apart from the obligations imposed by other regulators. It listed as a "core principle[]" of infection prevention that there must be "[e]ffective cohorting of residents (e.g., separate areas dedicated COVID-19 care)." CMS emphasized that its core principles "should be adhered to at all times."

28.    On March 2, 2021, MDHHS updated its mandates in an order entitled "March 2, 2021 Requirements for Residential Care Facilities—Rescission of December 8, 2020 Order." Although the new order allowed for visitation under certain circumstances, it required facilities to prohibit visitation in some situations, including when a new COVID-19 case originated within the facility in the past 14 days.

29.    On March 10, 2021, CMS updated QSO-20-39-NH. The updated document instructed facilities to "limit visitor movement" and to "suspend visitation for all residents" in certain outbreak scenarios. The March 10 revision maintained the requirement to have "[e]ffective cohorting of residents (e.g., separate areas dedicated to COVID-19 care)."

30.    Then, on March 17, 2021, MDHHS issued an order entitled "March 17— Requirements for Residential Care Facilities—Rescission of March 2, 2021 Order," which instructed that facilities "shall comply" with the March 10 CMS update.

31.    CMS once again updated QSO-20-39-NH on April 27, 2021. Like its precursors, it mandated "[e]ffective cohorting of residents (e.g., separate areas dedicated to COVID-19 care)" and required suspension of visitation in certain outbreak scenarios.

32.    MDHHS issued a new directive on May 21, 2021, entitled "May 21, 2021— Requirements for Residential Care Facilities—Rescission of March 17, 2021 [Order]," which again included the "shall comply" language regarding QSO-20-39-NH. The May 21, 2021 order remained in effect through the third quarter of 2021.

33.     In its communications with facilities, MDHHS emphasized the lack of discretion. For instance, in a March 17, 2021 email, MDHHS informed facilities that the order issued that day "directs ALL **residential care facilities** to follow" CMS guidance.

34.     All of the MDHHS orders contained specific warnings about penalties in the event of noncompliance. Potential consequences for violations included incarceration for up to six months and fines of up to $1,000 per day.

35.     Restrictions imposed by MDHHS governed Plaintiff's operations throughout the time periods at issue in this complaint. Indeed, as late as October 7, 2021, MDHHS reminded facilities that they are "required to adhere to the May 21, 2021…epidemic order."  In that same document, MDHHS reiterated prior directives that facilities "are to comply with the requirement" to "mask and maintain physical distance of at least 6 feet" in communal settings when "unvaccinated residents are present." A frequently asked question in the MDHHS document was, with emphasis in the original, whether CMS's "core principals and best practices" are "considered to be <u>requirements</u> for residential care facilities or only <u>guidance to be considered</u>." In responding to the question, MDHHS stated that "Residential Care Facilities are required to comply with the guidance presented in CMS QSO 20-39-NH as revised on April 27, 2021."

36.     Plaintiff is governed by the Barry County Department of Health and Human Services Board, which itself is a governmental entity. As a result, independent of the other sources of authority, restrictions directed or authorized by the Board constituted qualifying government orders.

## PARTIAL SUSPENSION

37.     Throughout the first three quarters of 2021, Plaintiff had 161 beds in a mix of private and semi-private rooms.

38.     Plaintiff's main source of revenue during this timeframe and all others is the provision of care to the residents who occupy those beds.

39.     Government orders directly led to beds being taken offline at various points in time in the first three quarters of 2021.

40.     Pursuant to its obligation, imposed via government orders, to have a separate space for COVID-positive residents, Plaintiff was required to leave beds reserved for such residents. During time periods when there were not enough COVID-positive residents to fill those beds, they were required to remain empty, even if there were COVID-negative putative residents who could have used them.

41.     To satisfy the requirement to have a separate space for COVID-positive residents, Plaintiff set aside beds throughout the first three quarters of 2021.

42.     The impacts of these orders are also visible in Plaintiff's census numbers, which measure the volume of residents in a given time period.

43.     Compared to the first quarter of 2019, the census for the first quarter of 2021 decreased by 4.5 percent.

44.     Compared to the second quarter of 2019, the census for the second quarter of 2021 decreased by 6.6 percent.

45.     Compared to the third quarter of 2019, the census for the third quarter of 2021 decreased by 13.5 percent. This 13.5 percent impact is sufficient by itself to meet the safe harbor provided under Notice 2021-20.

46.     Certain segments of Plaintiff's operations, including housekeeping, therapy services, and dietary services, were suspended or severely restricted during the relevant timeframe. Due to governmental orders, Plaintiff ceased offering group physical therapy and rehabilitation.

Plaintiff was also required to cease specialized memory care services, such as mental acuity and exercise, memory classes, small group gatherings to stimulate conversation and memory, and organized outings. In addition, Plaintiff discontinued offering group dining for patients and their families, animal care, and music therapy. These specialized memory care services are a significant portion of Plaintiff's business, and they were discontinued due to governmental orders.

47.    The portions of these three segments—housekeeping, therapy services, and dietary services—impacted by government orders collectively comprised more than 10 percent of Plaintiff's service hours in each of the first three quarters of 2019. The interruption of these services is therefore sufficient by itself to meet the safe harbor provided under Notice 2021-20.

48.    To give an example, Plaintiff's revenue from physical, occupational, and speech therapy dropped from approximately $1.36 million in 2019 to approximately $408,000 in 2021. This equates to a 70 percent drop in therapy revenue between 2019 and 2021.

49.    The interruptions described above also prohibited Plaintiff from meeting the expectations of certain residents and family members, which caused Plaintiff to lose residents. Additionally, the inability to consistently conduct group therapy led to worse clinical outcomes for residents, which in turn impacted skilled nursing revenue. Although Plaintiff, as an essential business, was required to remain open, members of the community always remain free to decide whether to use the facility for the care of themselves and their loved ones.

50.    There were numerous instances in the first three quarters of 2021 of would-be residents electing not to be admitted, or of residents electing to leave early, due to the government-imposed restrictions.

51.    Compared to the first quarter of 2019, new admissions for the first quarter of 2021 decreased by more than 64 percent.

52.    Compared to the second quarter of 2019, new admissions for the second quarter of 2021 decreased by more than 72 percent.

53.    Compared to the third quarter of 2019, new admissions for the third quarter of 2021 decreased by more than 53 percent.

54.    These admissions decreases are sufficient by themselves to meet the safe harbor provided under Notice 2021-20.

55.    Plaintiff also experienced consistent changes to the format of the services it was able to provide throughout the first three quarters of 2021. For instance, when communal dining was prohibited, meals needed to be delivered individually to residents' rooms.

56.    Plaintiff was required to suspend visitation on a number of occasions. With limited exceptions, visitation was not allowed at all between January 1, 2021 and March 2, 2021 due to MDHHS's December 8, 2020 order. Between March 2, 2021 and September 30, 2021, Plaintiff halted visitation many times due to staff outbreaks, as required by the interplay between MDHHS orders and QSO-20-39-NH. Specifically, there were at least 34 COVID-positivity cases among staff in the first three quarters of 2021, with at least one case occurring in every month except for June.

57.    The staff outbreaks also required residents to be restricted to their rooms for prolonged periods, as required by the interplay between the MDLRA order and CDC guidance.

58.    At all relevant times, Plaintiff had numerous unvaccinated residents, which triggered special MDHHS-imposed masking and social distancing requirements in communal settings.

59.    These changes caused a significant negative impact on Plaintiff's operating model, as well as on its marketability to prospective and current residents and their families.

60.    Under the relevant facts and circumstances, Plaintiff's operations were partially suspended throughout the first three quarters of 2021.

**<u>COUNT I: FIRST QUARTER OF 2021</u>**

61.    Plaintiff incorporates by reference paragraphs 1–60.

62.    On November 19, 2021, Plaintiff filed a refund claim seeking an ERC in the amount of $1,667,320.07 for the first quarter of 2021. *See* Exhibit 1 (with redactions).

63.    The amount of the ERC was properly calculated in accordance with 26 U.S.C. § 3134, as reflected in Exhibit 1.

64.    None of the qualifying wages that formed the basis for the ERC calculation were paid with payroll costs from Paycheck Protection Program ("PPP") loan forgiveness. Plaintiff excluded from the eligible wages the qualified wages included in the payroll costs reported on any PPP loan forgiveness application.

65.    Plaintiff previously paid all applicable employment taxes for the first quarter of 2021.

66.    Plaintiff was eligible for the ERC under both 26 U.S.C. § 3134 and Notice 2021-20 because it experienced a partial suspension of operations due to government orders.

67.    Even assuming that Plaintiff did not qualify under Notice 2021-20, that Notice is not binding, lacks the force of law because it did not undergo notice-and-comment procedures in accordance with the Administrative Procedure Act, and cannot lawfully form the basis for a denial.

68.    Plaintiff timely filed its refund claim for the first quarter of 2021.

69.    The IRS improperly denied the refund claim on March 13, 2024.

70.    This suit is timely because it was commenced within two years of the date of the IRS's denial.

71.      Plaintiff is entitled to a refund of $1,667,320.07 for the first quarter of 2021, plus interest as allowed by law.

## COUNT II: SECOND QUARTER OF 2021

72.      Plaintiff incorporates by reference paragraphs 1–60.

73.      On April 27, 2022, Plaintiff filed a refund claim seeking an ERC in the amount of $1,560,393.33 for the second quarter of 2021. *See* Exhibit 2 (with redactions).

74.      The amount of the ERC was properly calculated in accordance with 26 U.S.C. § 3134, as reflected in Exhibit 2.

75.      None of the qualifying wages that formed the basis for the ERC calculation were paid with payroll costs from PPP loan forgiveness. Plaintiff excluded from the eligible wages the qualified wages included in the payroll costs reported on any PPP loan forgiveness application.

76.      Plaintiff previously paid all applicable employment taxes for the second quarter of 2021.

77.      Plaintiff was eligible for the ERC under both 26 U.S.C. § 3134 and Notice 2021-20 because it experienced a partial suspension of operations due to government orders.

78.      Even assuming that Plaintiff did not qualify under Notice 2021-20, that Notice is not binding, lacks the force of law because it did not undergo notice-and-comment procedures in accordance with the Administrative Procedure Act, and cannot lawfully form the basis for a denial.

79.      Plaintiff timely filed its refund claim for the second quarter of 2021.

80.      The IRS improperly denied the refund claim on March 13, 2024.

81.      This suit is timely because it was commenced within two years of the date of the IRS's denial.

13

82.     Plaintiff is entitled to a refund of $1,560,393.33 for the second quarter of 2021, plus interest as allowed by law.

## COUNT III: THIRD QUARTER OF 2021

83.     Plaintiff incorporates by reference paragraphs 1–60.

84.     On May 9, 2022, Plaintiff filed a refund claim seeking an ERC in the amount of $1,703,582.15 for the third quarter of 2021. *See* Exhibit 3 (with redactions).

85.     The amount of the ERC was properly calculated in accordance with 26 U.S.C. § 3134, as reflected in Exhibit 3.

86.     None of the qualifying wages that formed the basis for the ERC calculation were paid with payroll costs from PPP loan forgiveness. Plaintiff excluded from the eligible wages the qualified wages included in the payroll costs reported on any PPP loan forgiveness application.

87.     Plaintiff previously paid all applicable employment taxes for the third quarter of 2021.

88.     Plaintiff was eligible for the ERC under both 26 U.S.C. § 3134 and Notice 2021-20 because it experienced a partial suspension of operations due to government orders.

89.     Even assuming that Plaintiff did not qualify under Notice 2021-20, that Notice is not binding, lacks the force of law because it did not undergo notice-and-comment procedures in accordance with the Administrative Procedure Act, and cannot lawfully form the basis for a denial.

90.     Plaintiff timely filed its refund claim for the third quarter of 2021.

91.     The IRS improperly denied the refund claim on March 13, 2024.

92.     This suit is timely because it was commenced within two years of the date of the IRS's denial.

93. Plaintiff is entitled to a refund of $1,703,582.15 for the third quarter of 2021, plus interest as allowed by law.

## JURY DEMAND

94. Plaintiff demands a jury trial on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in its favor and against Defendant for:

a. A refund in the amount of $1,667,320.07, or such other amount as the Court finds to be refundable, plus interest on that amount as provided by law, for the first quarter of 2021;

b. A refund in the amount of $1,560,393.33, or such other amount as the Court finds to be refundable, plus interest on that amount as provided by law, for the second quarter of 2021;

c. A refund in the amount of $1,703,582.15, or such other amount as the Court finds to be refundable, plus interest on that amount as provided by law, for the third quarter of 2021;

d. Reasonable litigation and administrative costs, including attorneys' fees, as allowed by law, including pursuant to 26 U.S.C. § 7430; and

e. Such other and further relief as the Court deems just and appropriate.

Dated: September 17, 2025

Respectfully submitted,

*/s/ Robert S. Silverblatt*
Robert S. Silverblatt
Bar Number: DC1020748
K&L Gates LLP
1601 K Street, N.W.
Washington, DC 20006
Telephone: (202) 778-9132
Facsimile: (202) 778-9100
Rob.Silverblatt@klgates.com
*Counsel for Plaintiff Thornapple Manor*